IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TODD NORMAN and<br>GINGER NORMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-367-SMD |
| | ) | |
| STATE FARM FIRE AND CASUALTY<br>COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION & ORDER

Plaintiffs Todd and Ginger Norman ("the Normans") claim that Defendant State Farm Fire and Casualty Company ("State Farm") breached their insurance contract in bad faith by failing to pay a claim for damage to their home. Before the Court is State Farm's Motion for Summary Judgment. Mot. (Doc. 24). For the following reasons, State Farm's motion is granted on the "normal" bad faith claim and denied on all other grounds.

## I.   JURISDICTION

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Pursuant to 28 U.S.C. § 1332, a federal district court may hear a civil action between citizens of different states where the amount in controversy exceeds $75,000. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 306 (2006).

"Except as otherwise provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant[.]" 28 U.S.C. § 1441(a). When a defendant removes a case

based on diversity jurisdiction, the defendant must show, by a preponderance of the evidence, that the amount in controversy is met. *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1226, 1241 (11th Cir. 2013). "In some cases, this burden requires the removing defendant to provide additional evidence demonstrating that removal is proper." *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061 (11th Cir. 2013). "In other cases, however, it may be facially apparent from the pleading itself that the amount in controversy exceeds the jurisdictional minimum, even when the complaint does not claim a specific amount of damages." *Id.* (citing *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 754 (11th Cir. 2010)).

If a defendant alleges that removability is apparent from the face of the complaint, the district court must evaluate whether the complaint itself satisfies the defendant's jurisdictional burden. In making this determination, district courts may make "reasonable deductions, reasonable inferences, or other reasonable extrapolations" from the pleadings. *Id.* at 1061-62 (quoting *Pretka*, 608 F.3d at 754). "Put simply, a district court need not suspend reality or shelve common sense in determining whether the face of a complaint establishes the jurisdictional amount." *Id.* (internal quotations omitted). "Instead, courts may use their judicial experience and common sense in determining whether the case stated in a complaint meets federal jurisdictional requirements." *Id.*

Here, the Court is satisfied that, based on the Normans' request for punitive damages, State Farm has proved the requisite amount in controversy by a preponderance of the evidence for this Court to exercise diversity jurisdiction over the complaint. Alabama law provides that "no award of punitive damages shall exceed three times the compensatory

damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), *whichever is greater*." ALA. CODE § 6-11-21 (a) (emphasis added). Importantly, the Eleventh Circuit has held that when a removing defendant alleges that a plaintiff's claim for punitive damages satisfies the amount in controversy, the defendant "need only prove the jurisdictional facts necessary to establish that punitive damages in an amount necessary to reach the jurisdictional minimum are at issue—that is, that such damages *could* be awarded." *McDaniel v. Fifth Third Bank*, 568 F. App'x 729, 731 (11th Cir. 2014) (emphasis original) (holding that the jurisdictional amount was satisfied by looking to the maximum possible recovery of punitive damages permitted by statute). Under Alabama law, then, the Normans could be awarded $500,000 or more in punitive damages, which is obviously greater than $75,000.

Further, the Normans make no disclaimer that they seek less than $75,000 for their claims. The absence of a disclaimer for overall damages is persuasive evidence that the Normans seek more than $75,000. *See Townsend v. Win-Holt Equip. Corp.*, 2018 WL 4608476, at *2 (M.D. Ala. Sept. 25, 2018) ("Although a plaintiff's refusal to stipulate that damages do not exceed $75,000 does not alone establish the amount in controversy, . . . the court may consider such refusal as evidence that the amount in controversy is met.").

Finally, a punitive damages award against a company as large as State Farm would need to be substantial to punish and deter similar future conduct. *Roe*, 637 F. Supp. 2d at 998, *aff'd*, 613 F.3d 1058 (11th Cir. 2013) (noting that "any award that is soundly and honestly calculated to punish and deter [a large company's] wanton behavior . . . would

3

have to be substantial"). Thus, the Court is persuaded that the amount in controversy likely exceeds $75,000.

In sum, because (1) the Normans could be awarded $500,000 or more in punitive damages; (2) the Normans have not disclaimed that they seek less than $75,000 for their claims; and (3) a punitive damages award would need to be substantial to deter conduct from a large company like State Farm, the Court finds that State Farm has shown, by a preponderance of the evidence, that the Normans' claims exceed the amount-in-controversy requirement. *See Pullum v. Ford Motor Co.*, 2019 WL 2578948, at *3 (M.D. Ala. June 21, 2019) (finding that the plaintiff's claims for punitive damages exceeded $75,000 where the damages were capped by state law at $500,000; the damages were sought against a large company; and the plaintiff did not expressly disclaim that the damages were less than the amount in controversy); *Stubbs v. State Farm Fire & Cas. Co.*, 2013 WL 980313, at *5 (N.D. Ala. Mar. 8, 2013) (finding that, based on the court's judicial experience and common sense, the plaintiffs' bad faith claim—which was based on allegations that the defendant "misrepresented the facts and the content of the Policy in a bad faith effort to refuse full payment"—exceeded the $75,000 amount in controversy requirement). Therefore, this Court has jurisdiction over the Normans' complaint pursuant to 28 U.S.C. § 1441(a).

## II.     UNDISPUTED MATERIAL FACTS

In 2000, the Normans purchased a home in Greenville, Alabama. Mr. Norman Depo. (Doc. 24-1) pp. 4-5. In late 2016/early 2017, the sheetrock in the home began to crack. *Id.* at 8; Ms. Norman Depo. (Doc. 24-2) p. 4. The Normans hired Alabama Foundation

Solutions ("AFS") to repair the damage. Mr. Norman Depo. (Doc. 34-17) pp. 7-10. AFS installed helical piers on the southern end of the home, and the Normans did not observe any further cracking for several years. *Id*. at 9.

In March 2017, the Normans purchased a home insurance policy with State Farm that contained supplemental sinkhole collapse coverage. Mr. Norman Depo. (Doc. 24-1) pp. 11-13; Policy (Doc. 1-1) pp. 6-57. The sinkhole collapse endorsement provided that State Farm would "pay for accidental direct physical loss to [the Normans' home] . . . caused by sinkhole collapse, meaning sudden settlement or collapse of the earth resulting from subterranean voids created by the action of water on limestone or similar rock formations." Policy (Doc. 1-1) p. 56. A little over two years after purchasing the policy, Mr. Norman heard a loud, popping noise, which he described as sounding "like a .22 going off." Mr. Norman Depo. (Doc. 24-1) p. 13. Thereafter, the Normans once again noticed visible signs of cracking in the sheetrock. *Id*.

The Normans filed a claim with State Farm in October 2019. Claim Denial (Doc. 34-12) p. 1; Handley Depo. (Doc. 24-5) p. 7. State Farm's adjustor, Jason Handley ("Handley"), inspected the Normans' home and surrounding property. Handley Depo. (Doc. 24-5) pp. 9-11. Finding no visible signs of what he considered to be a sinkhole,[1] Handley hired a soil geologist, Ron Maggard ("Maggard"), to assess whether the damage to the Normans' home was caused by sinkhole collapse. *Id*. at 11-15. On October 24, 2019,

---

[1] Handley defined a sinkhole as a "complete falling away of the earth" where "not necessarily just the surface but all of the ground" completely falls away. Handley Depo. (Doc. 24-5) p. 5. He contends that one "would be able to visibly see a sinkhole and the falling away of the earth." *Id*. at 6-7.

Maggard took soil samples up to seven feet deep and concluded that the cracking was due to a clay issue that was not properly repaired by AFS, not a sinkhole. Maggard Depo. (Doc. 24-6) pp. 12-22, 36; Maggard Report (Doc. 36-1) pp. 8-9. Based on Maggard's report, State Farm denied coverage of the Normans' claim on November 20, 2019. Claim Denial (Doc. 34-12) p. 1.

After the initial denial of their claim, the Normans hired Gordon Davis ("Davis'), an engineer with knowledge of sinkholes, to inspect their home. Mr. Norman Depo. (Doc. 24-1) p. 25. On November 27, 2019, Davis submitted a report to the Normans that concluded that the cracking was caused by movement in the foundation resulting from the consolidation of loose or weakly compacted soils beneath the foundation. Davis Report (Doc. 34-2) pp. 1-8. Davis reached this conclusion by visually inspecting the property and by reviewing old topography maps, which suggested that the Normans' house was likely built on fill dirt. *Id.*; Davis Depo. (Doc. 24-4) pp. 8-9, 12-16; 25-28. He also opined that the helical piers installed by AFS caused movement in the foundation. Davis Depo. (Doc. 24-4) pp. 28-31, 38; Davis Report (Doc. 34-2) p. 7. He did not opine that sinkhole collapse caused the damage but stated that he observed at least one sinkhole on the Normans' property. Davis Depo. (Doc. 24-4) pp. 45-46. The Normans submitted Davis's report to State Farm and State Farm denied the claim for a second time in December 2019. Ms. Norman Depo. (Doc. 24-2) pp. 8-9.

Subsequently, in response to street damage occurring in the Normans' neighborhood, the City of Greenville ("the City") drilled in the area to determine if there was sinkhole activity. Mr. Norman Depo. (Doc. 24-1) pp. 35-36. Based on its inspection,

the City determined that there was possible "sinkhole related activity" present in the Normans' neighborhood. City Report (Doc. 34-7) p. 1. The Normans submitted a copy of the City's November 2020 report to State Farm in March 2021. Ms. Norman Depo. (Doc. 24-2) pp. 9-10; Mr. Norman Depo. (Doc. 24-1) p. 36. State Farm submitted the City's report to Maggard for further review. Handley Email (Doc. 34-8) p. 1.

In December 2021, Hank Oakes ("Oakes"), who works for a consulting firm that samples and evaluates soil, examined the Normans' property at their request to determine whether there was a sinkhole or sinkhole activity.[2] Oakes Depo. (Doc. 24-3) pp. 5, 15-20. Oakes drilled a single boring in the Normans' yard and collected soil samples. *Id*. at 21-28. While drilling, Oakes discovered a 6-inch void between 11 to 11.5 feet underground. *Id*.; Oakes Depo. (Doc. 34-14) p. 3. From the soil samples, Oakes concluded that there were two different types of soil above and below the void—the one above was silty clay and the one below was sandy fat clay. Oakes Depo. (Doc. 24-3) p. 24. He described these soils as the "constituents of weathered limestone" and noted that the weathered limestone appeared from the bottom side of the void to 25 feet deep. *Id*. at 33-34. Oakes opined that the void had not yet subsided to the fat clay, and he was unable to determine how large the void was prior to the subsidence. *Id*. at 30-34. However, he did conclude that "[t]he void encountered was the result of dissolution of limestone." *Id*. at 33. Further, Oakes opined that the damage to the Normans' home was due to differential settlement that occurred as

---

[2] Oakes defines a sinkhole as "subsidence or collapse of soil into a void created by dissolution of limestone." Oakes Depo. (Doc. 24-3) pp. 15, 20. He considers subsidence to be downward movement and collapse to "be the full extent of the downward movement" that happens "instantaneously," while subsidence (or settlement) would occur gradually. *Id*.

"a direct result of ground subsidence resulting from the sinkhole activity beneath or in close proximity to the Norman residence." Oakes Letter (Doc. 34-4)[3] p. 1.

Oakes's report was submitted to State Farm in January 2022, and Handley forwarded the report to Maggard to determine if the report presented "anything that would declare definite sinkhole activity that is sudden." Handley Email (Doc. 34-5) p. 1. Handley claims that he forwarded the report on January 28 or 29, 2022, but Maggard testified that he did not receive Oakes's report until March 29, 2022. Handley Depo. (Doc. 34-13) p. 25; Maggard Depo. (Doc. 34-15) p. 18. Maggard submitted his written report to State Farm on April 6, 2022. Maggard Depo. (Doc. 34-15) p. 16. Maggard's report once again concluded that the newly submitted evidence did not change his original opinion regarding the cause of the cracking. Maggard Depo. (Doc. 24-6) pp. 37-38. The final denial of the Normans' claim was by letter dated March 15, 2022, which is fourteen days prior to when Maggard recalls receiving Oakes's report. Denial Letter (Doc. 34-10) p. 1.

## III.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

---

[3] This letter is dated December 16, 2022, and appears to be based on Oakes's personal inspection of the Normans' property as well as a review of Davis's report.

To survive summary judgment, a non-movant must assert facts that make a sufficient showing on every essential element of his case on which he bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Unsupported conclusions, factual allegations, and allegations based on speculation are insufficient to create a genuine issue of material fact. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). In reviewing a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 707 (11th Cir. 2019).

## IV.    DISCUSSION

The Normans bring breach of contract and bad faith claims against State Farm. Compl. (Doc. 1-1) pp. 2-3. Alabama law governs these claims, *see Eerie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), and this Court is "bound to decide the case the way it appears the state's highest court would," *Towne Realty, Inc. v. Safeco Ins. Co.*, 854 F.2d 1264, 1269 n.5 (11th Cir. 1988).

### A. Breach of Contract Claim

A breach of contract claim under Alabama law requires: (1) a contract between the parties, (2) performance by the party alleging breach of contract, (3) lack of performance by the defendant, and (4) damages resulting from the defendant's non-performance. *Ex Parte Alfa Mut. Ins. Co.*, 799 So. 2d 957, 962 (Ala. 2001).

State Farm argues that it did not breach its contract with the Normans because it was not required to perform under the terms of the sinkhole collapse endorsement. Mot. (Doc. 24) pp. 42-43. The sinkhole collapse endorsement covers "accidental direct physical loss to [the Norman's home] . . . caused by sinkhole collapse, meaning sudden settlement or collapse of the earth resulting from subterranean voids created by the action of water on limestone or similar rock formations[.]" Policy (Doc. 1-1) p. 56. State Farm contends that the terms of the endorsement are unambiguous and that damage to the Normans' home was "caused by settlement, earth movement, and poor workmanship done in 2017," and "not by a sinkhole as defined by the endorsement." Mot. (Doc. 24) pp. 42-43. The Normans, on the other hand, argue that terms in the endorsement are ambiguous and that, when those terms are construed in their favor, they have presented evidence sufficient to survive summary judgment. Resp. (Doc. 34) pp. 29-31.

Whether a contract is ambiguous is a question of law. *Federated Mut. Ins. Co. v. Abston Petroleum, Inc*., 967 So. 2d 705, 709 (Ala. 2007). "The test to be applied by [a] court in determining whether there is ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean." *Porterfield v. Audubon Indem. Co*., 856 So. 2d 789, 799 (Ala. 2002) (internal citations and quotations omitted). The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to the meaning of the terms. *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308 (Ala. 1999). In determining whether ambiguity exists, a court should apply the common interpretation of the language alleged

to be ambiguous. *Id*. This means that the terms of an insurance policy should be given a rational and practical construction. *Id*. In interpreting policy language, a court cannot consider the language in the policy in isolation but must consider the policy as a whole. *Id*.

"Under Alabama law, when doubt exists as to whether coverage under an insurance policy is provided, language used by the insurer must be construed for the benefit of the insured." *Assoc. Scrap Metal, Inc. v. Royal Globe Ins. Co*., 927 F. Supp. 432, 437 (S.D. Ala. 1995). "[E]xceptions to insurance coverage are to be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and such clauses must be construed most strongly against the company that issued the policy." *Id*. (citing *State Farm Mut. Auto. Ins. Co. v. Lewis*, 514 So. 2d 863, 865 (Ala. 1987); *Wakefield v. State Farm Mut. Auto. Ins. Co.*, 572 So. 2d 1220 (Ala. 1990); *Smith v. Horace Mann Ins. Co.*, 713 F.2d 674 (11th Cir. 1983)).

### 1. "Sudden," as used in the sinkhole collapse endorsement, is ambiguous and should be construed in the Normans' favor.

State Farm argues that there is no evidence showing that the damage to the Normans' home was caused by a "sudden" settlement or collapse of the earth as required under the sinkhole collapse endorsement. Mot. (Doc. 24) p. 42. State Farm's policy does not define "sudden." However, State Farm contends that the term is not ambiguous and urges the Court to apply its temporal meaning of "not 'gradual.'" Reply (Doc. 36) p. 6. On the other hand, the Normans argue that "sudden" is ambiguous and ask the Court to interpret it to mean "unexpected." Resp. (Doc. 34) pp. 29-31. Under the latter definition,

the Normans contend that they meet the requirements for coverage under the endorsement. *Id*.

The Cambridge Dictionary defines "sudden" as "[h]appening or done quickly and without warning."[4] Similarly, Miriam-Webster's Dictionary defines "sudden" as "happening or coming unexpectedly," "changing angle or character all at once," "marked by or manifesting abruptness or haste," or "made or brought about in a short time."[5] Based on these definitions, "sudden" is reasonably interpreted to mean "unexpected," "abrupt," or "brought about in a short time." *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 250 F. Supp. 3d 1311, 1316 (M.D. Fla. Apr. 21, 2017) (finding that, based on dictionary definitions of "sudden," a reasonable person in the insured's position would understand the term to mean unexpected, abrupt, or brought about in a short time as it pertained to a similar sinkhole collapse coverage endorsement). Thus, because there are multiple reasonable meanings of "sudden," the Court finds that the term is ambiguous. *See Claussen v. Aetna Cas. & Sur. Co*., 888 F.2d 747, 750 (11th Cir. 1989) (finding that "sudden" has more than one reasonable meaning); *Ala. Plating Co. v. U.S. Fidelity & Guar. Co*., 690 So. 2d 331, 335 (Ala. 1996) ("At a minimum, the word 'sudden' is ambiguous."); *Assoc. Scrap Metal*, 927 F. Supp. at 438 (concluding that "sudden" is ambiguous based on the fact that dictionaries contain multiple meanings of the word).

---

[4] Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/sudden (last visited July 24, 2023).

[5] Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sudden (last visited July 24, 2023).

Having found that "sudden" is ambiguous, the Court turns to the overall language in the Normans' policy to discern State Farm's intent in drafting the sinkhole collapse endorsement. To begin, State Farm's general homeowner's policy explicitly excludes coverage for earth movement events—including sinkholes—"*regardless* of . . . whether the event occurs *abruptly* or *gradually*[.]" Policy (Doc. 1-1) p. 32 (emphasis added). State Farm's use of the terms "abruptly" and "gradually" indicate that it intended to deny coverage for earth movement events—like sinkholes—irrespective of their temporal nature.

State Farm's sinkhole coverage endorsement amended the general policy to remove sinkholes from the category of uninsured earth movement events. In drafting the endorsement, State Farm could have used the same terms it used in the general policy to restrict or allow coverage based on the temporal nature of the sinkhole. For example, State Farm could have expressly denied coverage for "gradually" occurring sinkholes or it could have expressly provided coverage for sinkholes occurring only as a result of "abrupt"[6] settlement or collapse. It did not. Instead, State Farm deviated from the terms used in the general policy and defined sinkhole collapse as "*sudden* settlement or collapse" of the earth. But as discussed above, "sudden" is subject to more than a temporal meaning. And because State Farm has not drafted its policy to clearly require the earth's settlement or

---

[6] The dictionary defines "abrupt" as "sudden *and* unexpected." Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/abrupt (last visited July 24, 2023). "Sudden" *and* "unexpected" indicate that "abrupt" has both temporal and non-temporal components.

collapse to be "not gradual," the ambiguity should be resolved in favor of the Normans to mean "unexpected."

Further, the meaning of the terms in the endorsement modified by "sudden" supports the conclusion that the non-temporal definition of "sudden" should apply. As noted above, the endorsement requires "sudden settlement or collapse" of the earth. Thus, "sudden" modifies both "settlement" and "collapse." [7]

"Settlement" is defined as "[a] *gradual* sinking of a structure, either by the yielding of the ground under the foundation or by the compression of the joints or material."[8] Should the temporal meaning of "sudden" be applied to modify "settlement," the endorsement would require "not gradual" "gradual sinking of a structure." Such a reading of the policy is nonsensical.

Likewise, "collapse" means "[t]o fall or shrink together *abruptly* and completely."[9] Should the temporal meaning of "sudden" be applied to modify "collapse," the endorsement would require "not gradual" "fall[ing] . . . together abruptly and completely." Applying the temporal definition of "sudden" in this context would serve no purpose other than to re-emphasize the abrupt nature of "collapse." Such a reading of the policy is redundant.

---

[7] The Court notes that it is unclear whether "sudden" modifies both "settlement" and "collapse" or only "settlement." However, for purposes of this opinion, the Court will assume that it modifies both.

[8] Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/settlement (last visited July 24, 2023).

[9] Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/collapse (last visited July 24, 2023).

In sum, then, the Court finds that "sudden" is ambiguous because it is subject to both temporal and non-temporal meanings and that the overall language in the policy does not advise that State Farm intended to apply the temporal meaning of the term in the sinkhole collapse endorsement. Thus, the Court finds that the non-temporal meaning of the term should be applied, as the Normans request, and construes the endorsement to require "[unexpected] settlement or collapse of the earth."

### 2. The evidence shows that there is a dispute of material fact as to whether the damage to the Normans' home was caused by "unexpected" settlement.

To survive summary judgment on their breach of contract claim, the Normans must show that there is a dispute of material fact as to whether the damage to their home was caused by "unexpected" settlement. The evidence shows that in 2017 AFS repaired cracks in the Normans' home. Mr. Norman Depo. (Doc. 24-1) pp. 8-10. The Normans testified that, following those repairs, they did not notice any visible cracking until two years later when Mr. Norman heard a popping noise. *Id.* at 9, 13. It was reasonable for the Normans to assume that, after AFS repaired their home, no additional settlement would occur, particularly considering the length of time between the repairs and the reoccurring damage. There is no evidence that the Normans believed their home was built on a sinkhole or other unsuitable soil condition when they purchased the policy.

The Court finds that this evidence is sufficient for a reasonable juror to conclude that the settlement of the Normans' home was "unexpected." As such, State Farm is not entitled to summary judgment on the Normans' breach of contract claim.

### 3. "Similar rock formations," as used in the sinkhole endorsement, is ambiguous and should be construed in favor of the Normans.

State Farm argues that—regardless of whether there was "sudden settlement or collapse" of the Normans' home—there is no evidence that the settlement or collapse "result[ed] from subterranean voids created by the action of water on limestone or similar rock formations." Mot. (Doc. 24) p. 42. State Farm's policy does not define or provide examples of rock formations similar to limestone. But State Farm contends that because there was no rock found in the soil samples, coverage is not triggered. *Id*. at 40. On the other hand, the Normans point to evidence showing that weathered limestone was discovered in the soil and argue that weathered limestone falls within the category of "similar rock formations" to limestone. Resp. (Doc. 34) pp. 33, 36.

As the drafter of the policy, State Farm could have established parameters for determining whether a rock formation is similar to limestone. Indeed, State Farm could have provided guidance as to the composition, permeability, or texture required for a rock formation to be considered similar to limestone. It did not. Presumably, an insured purchasing State Farm's sinkhole collapse endorsement is not an expert in geology, and neither is the Court. Without any guidance to determine the type of rock formation necessary to trigger coverage under the endorsement, the Court finds that the term "similar rock formations" is ambiguous and should be construed in a manner most favorable to the Normans. *See Betz v. Erie Ins. Exchange*, 957 A.2d 1244, 1254 (Penn. 2008) (finding that the Pennsylvania trial court did not err in determining that "similar rock formations" was

"reasonably susceptible of different constructions and capable of being understood in more than one sense" and construing the term in favor of the plaintiffs).

> **4.  The evidence shows that there is a dispute of material fact as to whether subterranean voids created by the action of water on limestone or a similar rock formation caused unexpected settlement or collapse of the earth.**

To survive summary judgment on their breach of contract claim, the Normans must show that a subterranean void was created by the action of water on a bedrock similar to limestone and that the void caused the settlement of their home. The Normans have presented evidence from Oakes, who found a void near the Normans' home when he drilled into the soil. Oakes Depo. (Doc. 24-3) pp. 21-24. The soil samples obtained by Oakes contained "weathered limestone," and Oakes testified that he believes the void near the Normans' home was the result of water that dissolved limestone over time. *Id.* at 35. The Court finds that this evidence is sufficient for a reasonable juror to conclude that a subterranean void was created by the action of water on limestone or a similar bedrock, which resulted in unexpected settlement or collapse.[10] Thus, State Farm is not entitled to summary judgment on the breach of contract claim.

*************************

In conclusion, the Court finds that the Normans have shown that there are disputed material facts regarding whether a subterranean void created by the action of water on

---

[10] State Farm argues that there is no evidence that the subterranean void was present *under* the Normans' home. Mot. (Doc. 24) p. 40. However, the sinkhole coverage endorsement does not require that the void be present under the Normans' home. Instead, the endorsement language requires damage from a subterranean void without specification as to where the void is in relation to the home. Construing the evidence in the light most favorable to the Normans, Oakes concluded that the subterranean void found on the Normans' property caused the damage to the home. This is sufficient to create a dispute of material fact for trial.

limestone or a "similar rock formation" caused their home to "unexpectedly" settle. Thus, State Farm's Motion for Summary Judgment as to the Normans' breach of contract claim is denied.

### B.  Bad Faith Claim

Under Alabama law, there are two types of bad faith insurance claims: (1) "normal" bad faith, or "bad faith refusal to pay," and (2) "abnormal" bad faith, or "bad faith failure to investigate." *See Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018); *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 349 (Ala. 2006). The tort of bad faith has four elements plus a conditional fifth element:

(1) an insurance contract between the parties that the insurer breached;

(2) an intentional refusal to pay the insured's claim;

(3) the absence of any reasonably legitimate or arguable reason for that refusal (*i.e.*, the lack of a debatable reason);

(4) the insurer's actual knowledge of the lack of any legitimate or arguable reason for denying the claim; and

(5) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (quoting *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)). To succeed on a "normal" bad faith claim, a plaintiff must prove the first four elements. *Garber v. Nationwide Mut.*

*Ins. Co.*, 2021 WL 5811733, at *9 (N.D. Ala. Dec. 7, 2021). To succeed on an "abnormal" bad faith claim, a plaintiff must prove all five. *Id*.

The Normans have asserted both a "normal" and an "abnormal" bad faith claim. The Court will address both in turn.

### 1.  "Normal" Bad Faith

"For a 'normal' bad-faith claim to be submitted to the jury, the underlying contract claim must be so strong that the plaintiff would be entitled to a preverdict judgment as a matter of law." *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 32 (Ala. 2008). As explained above, questions of material fact exist as to whether State Farm breached the contract with the Normans; thus, the Normans are not entitled to judgment as a matter of law for their breach of contract claim. As such, to the extent the Normans are asserting a "normal" bad faith claim, the claim will not be submitted to the jury. *See Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982) ("Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the ['normal' bad faith] claim must fail and should not be submitted to the jury.").

### 2.  "Abnormal" Bad Faith

An insured can succeed in an "abnormal" bad-faith claim by showing (1) an intentional or reckless failure to investigate a claim, (2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, (3) the manufacture of a debatable reason to deny a claim, or (4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim. *See White*, 953 So. 2d at 349. While "[t]he existence of a

debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim," *Brechbill*, 144 So. 3d at 259 (emphasis omitted), "[t]he absence of a debatable reason not to pay a claim cannot be grounded on the vagaries of construction of an ambiguity." *Emps. Benefit Ass'n v. Grissett*, 732 So. 2d 968, 977 (Ala. 1998). Otherwise, "if an insurer's subjective interpretation of an insurance policy could create the fairly debatable reason needed to defend a bad faith claim, then insurers would be encouraged to write ambiguous insurance policies." *Blackburn v. Fidelity & Deposit Co. of Maryland*, 667 So. 2d 661, 669 (Ala. 1995).

Here, State Farm denied the Normans' claim on November 20, 2019. Claim Denial (Doc. 34-12) p. 1. At that time, Handley and Maggard had inspected the Normans' property and concluded that the damage to the home was not caused by sinkhole collapse. Importantly, however, Maggard's opinion appears to be based on the endorsement language requiring "*sudden* settlement or collapse" resulting from "subterranean voids created by the action of water on limestone or *similar rock formations*." Maggard Depo. (Doc. 24-6) pp. 7-8, 14. And Handley specifically relied on these ambiguous provisions to conclude that there was no coverage under the endorsement. Handley Depo. (Doc. 24-5) pp. 22-23, 29-30, 37; Handley Depo. (Doc. 34-13) pp. 4, 10-11, 16-23. But as discussed above, "sudden" and "similar rock formations" are ambiguous terms and, therefore, cannot form the basis of the denial of the Normans' claim. Thus, because State Farm relied on ambiguous terms in the sinkhole collapse endorsement to deny the Normans' claim, the "abnormal" bad-faith claim survives summary judgment. *See Garber*, 2021 WL 5811733, at *11 ("[A]n insurer's interpretation of an ambiguous term in an insurance policy cannot

serve as a reasonably legitimate, arguable, or debatable reason for a claim denial, at least for abnormal bad faith claims."); *Wilson v. Cent. United Life Ins. Co.*, 2011 WL 13285996, at *11 (N.D. Ala. Aug. 19, 2011) (denying summary judgment on an abnormal bad faith claim because the insurer relied on ambiguous provisions that were not construed favorably to the insured to deny policy coverage); *but see Lemons v. Principal Life Ins. Co.*, 497 F. Supp. 3d 1192, 1201-02 (N.D. Ala. Oct. 26, 2020) (granting summary judgment on an abnormal bad faith claim because the debatable reason for denying the insured's claim was not a product of the ambiguities in the policy).

Alternatively, the Court finds that the Normans' "abnormal" bad faith claim survives summary judgment because there is a factual dispute as to the information State Farm possessed when it denied the Normans' reopened claim. The evidence shows that State Farm reopened the Normans' claim after receiving the City's report in March 2021. Ms. Norman Depo. (Doc. 24-2) p. 10; Handley email (Doc. 34-8) p. 1. In January 2022, the Normans submitted Oakes's report to State Farm. *Id*. Handley sent the report to Maggard to determine whether coverage was required under the policy. *Id*. Handley drafted a letter denying the Normans' reopened claim on March 15, 2022. Denial Letter (Doc. 34-10) p. 1. Handley testified in his deposition that he discussed Oakes's report with Maggard *before* drafting the March 15 letter. Handley Depo. (Doc. 34-13) pp. 14, 23-24. Maggard testified, however, that he did not see Oakes's report before March 29, 2022, which is fourteen days *after* the denial letter was drafted. Maggard Depo. (Doc. 34-15) pp. 18-19. Maggard also testified that he probably did not speak with Handley before issuing his report, which was dated April 6, 2022. *Id*. p. 24.

Construing this evidence in the light most favorable to the Normans, the Court finds that there is a genuine dispute of material fact as to when the Normans' claim was actually denied and whether State Farm recklessly failed to investigate the Normans' reopened claim. As such, to the extent that the Normans are asserting an "abnormal" bad faith claim, State Farm is not entitled to summary judgment on that claim. *See Mut. Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1316 (11th Cir. 2004) ("[T]he difficulty with making a determination on whether [the insurer] recklessly failed to investigate [the insured's] claim is that there are factual questions regarding exactly when the denial of coverage occurred" when there were three letters sent to the insured denying coverage); *Garber*, 2021 WL 5811733, at *13 ("[B]ecause factual issues remain regarding whether [the insurer] presented legitimate or debatable reasons for denying [the insured's] . . . claim, the court cannot grant judgment on the pleadings in [the insurer's] favor on [the insured's] bad faith claim[.]"); *but see Brechbill*, 144 So. 3d at 259 (granting summary judgment for a bad faith claim because, even if State Farm did not perfectly investigate or reinvestigate the plaintiff's claim, their investigation did not rise to the level of dishonesty, self-interest, or ill will inherent in bad-faith conduct).

## V.   CONCLUSION

For the reasons set forth above, it is

ORDERED that State Farm's Motion for Summary Judgment (Doc. 24) is GRANTED on the "normal" bad faith claim and DENIED on all other grounds.

DONE this 7th day of August, 2023.

Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE